UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                  :
In re:                                            :
                                                  :        Case No.: 07-12358 (MG)
            Caren Kohl,                           :        Chapter 7
                                                  :
                              Debtor.             :
-------------------------------------------------------x

**MEMORANDUM OPINION OVERRULING OBJECTIONS TO (1) THE
TRUSTEE'S MOTION SEEKING AUTHORIZATION TO MAKE
DISTRIBUTIONS FROM PROCEEDS OF SALE; (2) THE APPLICATIONS OF
LAW FIRMS, ACCOUNTANTS AND APPRAISER FOR ALLOWANCE OF
COMPENSATION AND APPROVAL OF EXPENSES; AND (3) THE
APPLICATION OF THE TRUSTEE FOR ALLOWANCE OF INTERIM
STATUTORY COMMISSIONS**

*A P P E A R A N C E S:*

KITTAY & GERSHFELD, P.C.
*Attorneys for Trustee of Caren Kohl*
100 White Plains Road
Tarrytown, New York 10591
By:     David R. Kittay, Esq.
        Judy Siegel, Esq.

AKERMAN SENTERFITT LLP
*Special Counsel to the Trustee*
335 Madison Avenue
New York, New York 10017
By:     Gregory T. Limoncelli, Esq.

DUANE MORRIS
*Attorneys for Silverlining Interiors, Inc.*
1540 Broadway
New York, NY 10036
By:     Frederick Cohen, Esq.

DAVID R. KITTAY
*Trustee of Caren Kohl*
100 White Plains Road
Tarrytown, New York 10591
By:     David R. Kittay, Esq.

**MARTIN GLENN**
United States Bankruptcy Judge

Before the Court is the Motion of David R. Kittay, ("the Trustee"), for an order for authorizing him to make a distribution from the proceeds of sale of Debtor's and Sam Kohl's interests in two apartments, located at 115 East 87th Street, New York, New York (together the "Apartment"). Also before the Court are fee applications for (i) Gary Lampert, as Accountant, (ii) Akerman Senterfitt LLP, as Special Counsel, (iii) Alan Offenberg, as Appraiser, (iv) Kittay & Gershfeld, P.C., as the Trustee's attorney, for an allowance of compensation and the approval of expenses; and (v) the Trustee for interim statutory commissions.

Silverlining Interiors, Inc. objected to (i) the Trustee's motion to make distributions from the proceeds of the sale, (ii) the fee application of Akerman Senterfitt LLP, (iii) the fee application of Kittay & Gershfeld, P.C.; and (iv) the Trustee's application for interim statutory commissions.

## BACKGROUND

This case—originally filed as a case under chapter 11 and later converted to a case under chapter 7—arises from the bankruptcy of Caren Kohl ("Debtor"). Debtor and her non-debtor spouse, Sam Kohl, had purchased two apartments in a Cooperative building (the "Co-op") on the Upper East Side of Manhattan, with the intention of performing a "gut" renovation combining the two apartments. The Kohl's held a proprietary lease and 283 shares of stock in the Co-op. The Kohls obtained a mortgage from Washington Mutual Bank ("WaMu") to purchase the Apartment.

The Kohls engaged an architect, Brian Doyle, A.I.A. ("Doyle"), and two contractors, Silverlining Interiors, Inc. ("Silverlining"), and I.J. Peiser's Sons, Inc. ("Peiser"), to perform the

renovations.  As is typical, the proprietary lease required that the Kohls promptly discharge or bond any mechanics' liens arising from the renovations.  The renovations did not go as planned (with more than $1.5 million in cost overruns).  Doyle, Sliverlining and Peiser placed mechanics' liens against the building.  Silverlining, alone, sought to recover an additional $1,139,558.02. The liens violated the proprietary lease so the Co-op began a holdover action in Civil Court, seeking to terminate the lease and evict the Kohls from the Apartment.  WaMu also scheduled a non-judicial foreclosure sale for July 31, 2007.  Debtor filed a voluntary petition under chapter 11, halting the Co-op's and WaMu's legal actions.

After commencing the chapter 11 case, the Debtor filed an adversary proceeding objecting to the validity of the mechanics' liens.  The case proceeded to trial after expedited discovery, but the trial ended when the parties reported that they had reached an agreement in principle to settle.  The settlement quickly fell apart, however, when the Kohls were unable to make the initial required payment to the contractors.  The Co-op filed a motion to lift the automatic stay to permit it to proceed with its state court eviction action.  The Debtor then moved to convert her case to a case under chapter 7.  The Court granted the motion to convert on June 3, 2008.  David R. Kittay was appointed as chapter 7 trustee.

*The Trustee's Involvement Begins*

The Trustee retained his own law firm, Kittay & Gershfeld, P.C. ("Kittay"), as counsel to the estate.  Kittay reached out to WaMu, the Co-op, and Silverlining to determine why previous negotiations failed.  In response, the parties began to work towards a global resolution.  Those parties were close to reaching a settlement when Merrill Lynch Business Financial Services, Inc. ("Merrill") appeared in the case, informed the parties that it held a district court judgment against Sam Kohl and a lien on his interest in the Apartment.  The Trustee continued negotiating and a

settlement, including Merrill, was soon reached.  The settlement was memorialized in a

stipulation (the "Stipulation") that enabled the Trustee to sell the Apartment and use the proceeds

to pay off the parties' various claims in a pre-determined order and amount.  The Court approved

the Stipulation on August 12, 2008.

*The First Attempt to Sell the Apartment*

After the chapter 11 case was filed, the Kohls attempted to sell the Apartment, at an

asking price of $2,999,999.  After the Trustee was appointed, he determined that this asking

price was too high.  Real estate brokers employed by the Trustee suggested a sale price in the

range of $2.3 to $2.8 million.

Anthony and Jane Providenti, (the "Providentis"), the Kohls' neighbors, expressed

interest in buying the Apartment, and offered $2.2 million, without a broker.  At first WaMu was

not convinced the proposed price was fair, but after obtaining its own appraisal, WaMu agreed

that the Trustee should accept the $2.2 million offer.

Because non-debtor Sam Kohl owned a one-half interest in the Apartment, the Trustee

moved for an order under 11 U.S.C. § 363(h) to permit a sale of the Apartment including Sam

Kohl's interest.  The Debtor initially objected.  The dispute was resolved with an agreement that

Sam Kohl would relinquish his interest in the Apartment, but the Kohls would be allowed to

remain in the Apartment until December 24, 2008, giving them time to find a new place to live.

If the Kohls didn't comply with the agreement, the Trustee could take necessary steps to regain

possession of the apartment.  The Court approved the agreement.

The December 24th deadline passed without the Kohls leaving the Apartment.  The

Trustee moved to hold Sam Kohl in contempt.  Before the Court ruled, a new agreement was

reached for the Kohls to leave the Apartment.  When they finally moved, however, the Kohls

allegedly removed plumbing, countertops, and other items from the recently renovated Apartment. The Court held a hearing at which the Trustee presented before and after photographs showing what the Kohls did and what they took when they finally moved out. The Court entered an Order requiring the Kohls to return most of the items they took and to repair the damage they did to the Apartment.

When the Providentis saw what had happened to the Apartment, they balked at closing on their purchase. The Manhattan real estate market had also continued to soften. On January 6, 2009, the Providentis sent a letter to the Trustee's real estate attorneys, Akerman Senterfitt, lowering the price the Providentis were willing to pay. The Trustee rejected this attempt to renegotiate the purchase price. The dispute could not be resolved.

*The Providenti and Kohl Litigations*

The Trustee filed an adversary proceeding against the Providentis, seeking to keep the Providentis' $220,000 down payment. The parties attempted to resolve the issue amicably. The Providentis offered to purchase the Apartment for the reduced price of $1.495 million. The Trustee retained a real estate broker to determine whether the reduced offer was in the best interests of the estate. The broker concluded that the Apartment would likely sell for less than $2 million on the open market after a potentially lengthy sales process. The broker also would not agree to reduce its commission if the Providentis were the ultimate purchaser of the Apartment.

The Trustee reached out to WaMu to gets its approval to sell to the Providentis at the reduced price. WaMu obtained a new appraisal, estimating the sale price at over $2 million. Therefore, WaMu refused to consent to a sale for less than $1.9 million. By mid-April, with no new buyers in the wings, the Trustee determined that the sale to the Providentis was in the best interests of the estate and decided to move forward with the transaction. To ensure that the

$1.495 million sale price was in the best interests of the estate, the Trustee employed an

independent appraiser, Offenberg and Associates ("Offenberg"), to value of the Apartment.

Offenberg opined that, taking into consideration real estate conditions in New York City, the

property was worth approximately $1.6 million.

*The Solomon Offer and Acquisition*

Before the Apartment could be sold to the Providentis at the reduced price, however, the

Tustee was approached by another potential buyer, the Solomons.  The Solomons offered $1.75

million for the Apartment.  The Trustee moved for an order approving the sale to the Solomons,

and the Court granted the motion on July 8, 2009.  Before closing on the sale, the Trustee had to

resolve several defaults under the proprietary leases relating to open building permits and liens

arising from the Kohls' renovations.  The closing was finally completed on September 15, 2009,

when the Solomons received approval from the Co-op board.

As a result of the reduced sale price ($1.75 million from the Solomons versus $2.2

million from the Providentis), under the payment priorities agreed upon by the parties under the

Stipulation approved by the Court on August 12, 2008, Silverlining stands to recover

substantially less on its claim.  In an effort to enhance its position, Silverlinging has objected to

virtually all of the fee applications in this case.  As explained below, Silverlining's objections are

without merit and are overruled.

## DISCUSSION

**A.    Motion Authorizing Distributions From the Proceeds of the Sale**

> *1.  The Stipulation Does Not Require WaMu to Pay for the Costs of Preserving,
>      Disposing or Attempting to Dispose of the Apartment*

Silverlining objects to the distribution of sale proceeds.  (Cohen Opp. at 4–9.)  It

maintains that WaMu agreed to pay the costs of selling the Apartment.  Silverlining points to

paragraph 3 of the Stipulation as "clear and unequivocal language" demonstrating that WaMu must shoulder the costs of preserving, disposing of, or attempting to dispose of the Apartment— including normal and special real estate counsel fees.  (*Id.* at 5.)  The last phrase of the paragraph states that WaMu "shall pay the reasonable, necessary costs and expenses of preserving, disposing of, or attempting to dispose of the Apartment[] including, without limitation, the legal and accounting fees and expenses of the Trustee and his professionals."  (Stipulation at ¶ 3.)

WaMu argues that this is not the proper interpretation of the Stipulation.  (DiCaro Dec. at 2.)  WaMu maintains that the title of paragraph 3 clearly contemplates payments pursuant to section 506(c) of the Bankruptcy Code.  According to WaMu, this means that WaMu is not obligated to pay any of the sale costs since WaMu did not benefit (and indeed it will recover nothing from the sale).  Silverlining contends that WaMu misreads the Stipulation, arguing that the requirement that WaMu pay the costs for preserving and disposing of the property has no limitations.

The Court agrees with WaMu's interpretation and finds Silverlining's reading of the Stipulation untenable.  The Stipulation is not ambiguous.  *Abuelhija v. Chappelle*, No. 08 CV 3679(HB), 2009 WL 1883787, at *5 (S.D.N.Y. June 29, 2009) ("A contract is not ambiguous merely because the parties urge different interpretations in the litigation.") (quoting *TLC Beatrice Intern. Holdings, Inc. v. CIGNA Ins. Co.*, 97 Civ. 8589(MBM), 2000 WL 282967, at *3 (S.D.N.Y. Mar. 16, 2000)).  The title of paragraph 3 reads:  "Consent to Payment Pursuant to Section 506(c) of the Bankruptcy Code."  Section 506(c) is an exception to the general principle that the expenses incurred administering an estate are not chargeable to the secured creditor's collateral.  4 COLLIER ON BANKRUPTCY ¶ 506.05 (15th ed. rev. 2007).  The express language of the statute reads:

> The trustee may recover from property securing an allowed
> secured claim the reasonable, necessary costs and expenses of
> preserving, or disposing of, such property to the extent of any
> benefit to the holder of such claim, including the payment of all ad
> valorem property taxes with respect to the property.

11 U.S.C. §506(c).

In order to recover expenses under section 506(c) from the owner of the collateral, a trustee must show that it incurred the expenditure "primarily for the benefit of the creditor and that the creditor directly benefited from the expenditure." *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985); *In re Ceron*, 412 B.R. 41, 48 (E.D.N.Y. 2009) (same). A secured creditor is interpreted as having received a benefit if the expense preserved the value of its collateral. "The general concept underlying this requirement is the prevention of a windfall to the secured creditor; a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the costs." 4 COLLIER ON BANKRUPTCY ¶ 506.05.

Here, WaMu gained no benefit and it cannot be expected to pay any costs pursuant to section 506(c). In fact, under the Stipulation, WaMu is last in line to collect sale proceeds and is due to receive *nothing* from the sale to the Solomons. It would turn section 506(c) on its head to require WaMu to pay the sale costs when, as the secured creditor, it is receiving no benefit from a sale of the collateral.

### 2. The Trustee Has Not Paid The Co-op More than it Was Entitled to Under the Stipulation

Silverlining argues that the Trustee has made payments to the Co-op in excess of the amount contemplated in the Stipulation. They maintain that the Trustee's payment of $393,703.33 from the proceeds of the sale of the property to the Co-op was a violation of paragraph 7(d) of the Stipulation, which reads:

> Payment to the Cooperative for pre- and post-petition maintenance charges accrued through August 30, 2008 and expenses including, without limitation, legal fees not to exceed $250,000 in the aggregate. The Cooperative shall provide an accounting of the pre- and post-petition maintenance charges at least two days prior to the closing of sale of the Apartments.

Silverlining maintains that this paragraph only allowed the Trustee to make payments of maintenance charges and expenses through August 30, 2008. Silverlining contends the Trustee improperly paid all maintenance charges incurred through the closing on the Apartment, without regard for the August 30, 2008 cut-off. Silverlining explicitly points to a $25,000 "Contract Section 11.3 Fee" the Trustee paid when closing the sale of the Apartment to the Solomons.

The Trustee acknowledges that he made payments for maintenance charges after August 30, 2008, but that the amounts he paid for the period before the August cut-off date were consistent with the Stipulation—specifically, the Trustee paid $241,973.28 in maintenance fees and legal costs for the period ending August 30, 2008, an amount below the cap set in the Stipulation. For the period after August 30, 2008, the Trustee paid the remaining $151,730.05 in charges. The Trustee explains that the Contract Section 11.3 Fee was the price of clearing open building permits on the Apartment so that the sale to the Solomons could close. The Trustee maintains that he was required to make these additional payments under paragraph 7(a)(3) of the Stipulation, as costs related to the sale of the property. (Trustee Response at 2–3.)

The Trustee is correct. Paragraph 7 of the Stipulation details the priority of payments from the sale proceeds. Under paragraph 7(a)(3) "costs related to sale" are paid immediately following the real estate broker's fee and the real estate and transfer taxes. Nothing in the four corners of the Stipulation indicates or implies that maintenance costs incurred after the August 30, 2008 cut-off date should not be paid if they relate to the sale of the property. Under the proprietary lease, unpaid maintenance and other required fees are a lien on the Apartment that

must be paid before a sale could be completed.  This includes the $25,000 payment to satisfy the

Contract Section 11.3 fee, incurred to lift open permits.

Looking beyond the plain language of the Stipulation, it appears that the parties intended

to pay maintenance fees and expenses after the August 30, 2008 cut-off date.  The Trustee's

motion seeking authority to sell the Apartment to the Solomons clearly contemplated the

payment of Co-op fees incurred after the August 30, 2008 deadline.  (*See* ECF # 199 at 11 n.4.)

Silverlining did not object.  Thus, there appears little doubt that both the plain language of the

contract and the intent of the parties require the payment of the additional funds identified by

Silverlining.

## B.    Fee Applications

Also pending before the Court are numerous fee applications.  Silverlining objects to the

applications of Kittay & Gershfeld, P.C. ("Kittay") and Akerman Senterfitt LLP ("Akerman").

Silverlining also objects to the calculation of the allowance of interim statutory commissions

sought by the Trustee.  WaMu filed a limited objection to the Kittay and Akerman applications

as well.  No objections were filed to the applications of Gary R. Lampert as accountant for the

Trustee ("Lampert"), or Alan Offenberg as the appraiser for the Trustee ("Offenberg").

The Court may award fees to professional persons pursuant to section 330 of the

Bankruptcy Code.  11 U.S.C. § 330.  Section 330 provides in relevant part:

> After notice to the parties in interest and the United States Trustee
> and a hearing, and subject to sections 326, 328 and 329, the court
> may award . . .
>
> > (A) reasonable compensation for actual, necessary services
> > rendered by the trustee, examiner, ombudsman,
> > professional person, or attorney and by any
> > paraprofessional person employed by an such person; and
> > (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

In determining reasonable compensation, section 330 directs the court to consider:

     (A) the time spent on such services;
     (B) the rates charged for such services;
     (C) whether the services were necessary to the administration of, or beneficial at the time which the services was rendered toward the completion of, a case under this title;
     (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem issue, or task addressed;
     (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
     (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

Whether services are necessary is determined from the perspective of the time at which the services were rendered.  3 COLLIER ON BANKRUPTCY ¶ 330.04[1][b][iii].  In the Second Circuit, the "necessary" standard in section 330 is given a broad interpretation.  Services are "necessary" if they benefit the estate.  *In re Keene Corp.*, 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997) (Bernstein, J.).  The test considers whether services provided were "reasonably likely to benefit the estate."  The test is objective, considering the services that a reasonable lawyer would have performed in the same circumstances.  *In re Ames Dept. Stores, Inc.*, 76 F.3d 66 (2d Cir. 1996).

The court has an independent duty to review fee applications and evaluate the compensation requested.  *In re Keene*, 205 B.R. at 695.  The court may reduce or disallow a request if the services provide no real benefit to the estate.  *Id.* at 696.  The court may also reduce

compensation if the request is based on incomplete or inaccurate time records. *In re Hamilton Hardware Co.*, 11 B.R. 326 (Bankr. E.D. Mich. 1981).

Fee applications must comply with Federal Rule of Bankruptcy Procedure 2016, which requires "a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." Fed. R. Bankr. P. 2016. Rule 2016 requires disclosure of any payments previously made to the applicant and of the existence of any compensation agreement between the applicant, their client and any third party who will share the compensation. *Id.* Also, Local Bankruptcy Rule 2016-1 requires that such entities "shall comply with the requirements contained in any guidelines for fees and disbursements promulgated by the Court."

Fee applications and interim fee applications for professionals seeking compensation pursuant to 11 U.S.C. §§ 327, 328, 330, and 331 must also comply with the Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases set forth in General Order M-151.[1] The Guidelines require certification by the responsible professional that the fee application has been read, that the application and the fees therein comply with the guidelines and that the fees are billed at rates customary to the applicant and generally accepted by the applicant's clients. *Id.* at 2. The application must also contain a certification that the (i) Trustee, (ii) chair of each official committee, and (iii) debtor have been provided copies of the fee application at least 10 days before a hearing on the application. *Id.* The certification must also list all professionals working on a given case, aggregate hours spent by each professional, and "a reasonably detailed breakdown of the disbursements incurred and an explanation of billing practices." *Id.*

General Order M-151 has specific requirements concerning disbursements, including a maximum of $.20 per page charge for photocopies, $1.25 for domestic faxes, and $2.50 for

---

[1]    Effective December 4, 2009, General Order M-151 has been superceded by General Order M-389.

international faxes; an explanation why any overtime expenses are "absolutely necessary" for the case; limits on meals to $20 per person, and for meals earlier than 8:00, reimbursement only if there is an additional 1 ½ hours of work expended after the dinner; prohibition on reimbursement for daytime meals "unless the individual is participating, during the meal, in a necessary meeting respecting the case"; and limits on cellular phone reimbursement to those expenses that are reasonably incurred, with routine use of cellphones "unacceptable." *Id*. at 3.

### 1. *Lampert Fee Application*

The Court approved the Trustee's request to employ Lampert as accountant on August 18, 2008. Lampert now seeks compensation in the amount of $3,930 for time expended on the case as well as expenses in the amount of $7 for work completed between July 23, 2008 and September 15, 2009. Lampert reviewed the debtor's books and records to assist the Trustee in adversary proceedings and with the sale of the debtor's residence.

Lampert's application includes the certification required by General Order M-151 and it complies with the requirements of the Guidelines.

This Court concludes that Lampert's services were necessary at the time rendered and benefited the estate. *See In re Keen Corp.*, 205 B.R. at 695. Thus, Lampert's request for fees for the July 23, 2008 through September 15, 2009 period is granted.

Lampert also requests an allowance of $1,000 to prepare 2009 tax returns for the estate but offers no detailed facts to support this request for work to be completed in the future. Therefore, the request for compensation for preparation of the 2009 tax returns is denied without prejudice.

### 2. *Offenberg Fee Application*

Offenberg, a real estate appraiser, was retained by the Trustee to appraise the Apartment in connection with the attempted sale. The Court approved the retention of Offenberg on May 14, 2009. (ECF # 192.) Offenberg completed an appraisal report on the property on May 21, 2009. Offenberg now applies to the Court for approval of a $2,000 fee for the appraisal. Offenberg's certification submitted with the application lacks many of the requirements set forth in General Order M-151. Therefore, Offenberg's application is denied without prejudice. If Offenberg submits the required certification, the application will be approved without further hearing.

### 3. *Akerman Fee Application*

Akerman acted as special real estate counsel to the Trustee through the many attempts to sell the Apartment. Akerman billed 325.02 hours for its work leading to the closing of the sale. It now seeks $127,742.20 in fees and $609.91 in expenses.

Silverlining objects generally to Akerman's request, arguing that there were too many conversations between Akerman and the other counsel for the Trustee. Silverlining argues that Akerman should explain why the large number of conferences was necessary. Silverlining takes specific issue with the time entries of Gregory T. Limoncelli and John J. Lee. Mr. Limoncelli recorded 72 hours, at a cost of over $30,000, communicating with Kittay attorneys. Mr. Lee recorded an additional 1.1 hours communicating with Kittay personnel. Silverlining also objects on the grounds that Akerman failed to provide project categories with its application, as required by the U.S. Trustee billing guidelines. Lastly, Silverlining maintains that the work Akerman conducted in connection with the Providenti offer to purchase the Apartment was wasted. According to Silverlining, an unreasonable amount of time and effort was spent trying to retain a

small amount of money for the estate.  In support of this position, Silverlining notes that the estate incurred over $150,000 in legal fees in an attempt to recover the Providenti's down payment of $220,000.

The Court overrules Silverlining's objections.  As an initial matter, the Court notes that Akerman's work was not limited to issues surrounding the Providentis.  As articulated in its application, Akerman also completed work in connection with removing the Kohls from the Apartment as well as completing the sale of the Apartment to the Solomons.

Courts reviewing fee applications have the benefit of perfect hindsight.  This, however, should not be used to penalize attorneys.  *See In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 767 (Bankr. E.D.N.Y. 2005) (observing that while courts must exclude excessive and unnecessary expenses of time when reviewing fee applications, courts "must not penalize attorneys by viewing the efforts of counsel with the benefit of '20/20 hindsight'").  Instead, fee applications are judged on whether the actions taken were reasonable at the time.  *In re Cenargo Intern., PLC*, 294 B.R. 571, 595 (Bankr. S.D.N.Y. 2003).  Based on these principles, Silverlining's complaints regarding the expenditures on the Providenti litigation lack merit.

Before the litigation was initiated, the Providentis threatened to walk away from the transaction, citing a material damage clause within the purchase contract.  Initiating a lawsuit against the Providentis eventually resulted in a revised offer to purchase the Apartment for $1.495 million.  Given the soft Manhattan real estate market, it was reasonable for the Trustee to use every means at his disposal to complete the sale to the Providentis.  The sale to the Providentis would have been completed if the Solomons had not stepped forward with a higher bid.  Attorneys should not be penalized in this instance, where the passage of time makes a reasonable decision appear questionable in the end.  *In re Keene Corp.*, 205 B.R. at 696.

Silverlining's contention that there were simply too many communications between co-counsel lacks merit. It is well accepted that conferences between co-counsel are compensable under the Bankruptcy Code. *In re Nat'l Paragon Corp.*, 87 B.R. 11, 13 (E.D. Pa. 1988) (reversing bankruptcy court's universal ban on fees for attorney conferences as an abuse of discretion). Still, the applicant must give an adequate explanation for more than a single attorney charging for internal meetings. *In re Poisedon Pools of Am.*, 180 B.R. 718, 731 (Bankr. E.D.N.Y. 1995). An applicant can meet this standard by identifying the other participants and explaining the nature and purpose of the meeting. *In re Bennet Funding Group, Inc.*, 213 B.R. 234, 245 (Bankr. N.D.N.Y. 1997) ("At a minimum, such entries should indicate the participants and the nature and purpose of the conference."). Silverlining fails to point to a single Akerman time entry that fails to identify the participants and the purpose of a conference. From the Court's independent review of Akerman's time entries, it appears that all conference descriptions adequately describe the participants and purposes of conferences.

Ackerman's application is accompanied by a certification from Gregory Limoncelli that satisfies the requirements of General Order M-151. The application also satisfies Federal Rule of Bankruptcy Procedure 2016. Based on the Court's review of the Application, the Court will, however, reduce the fee award by $1,880.56, based on time entries for travel time within Manhattan, and block billing which is not permitted.

### 4. *Kittay & Gershfeld Fee Application*

Kittay & Gershfeld requests fees totaling $394,518 and reimbursement of disbursements in the amount of $16,523.55. Kittay, however, currently only seeks to receive compensation of $322,175.25 for fees and $15,582.70 in expenses related to the sale of the Apartment. Silverlining objects to the fees, claiming that the firm spent an inordinate amount of time attempting to retain the $220,000 down payment initially placed on the property by the Providentis. Silverlining also takes issue with (i) the time and effort K&G expended negotiating with WaMu regarding the sale of the Apartment for less than the Providentis' intial $2.2 million offer; (ii) purportedly excessive billing for inter-office communications; and (iii) fees that are generally excessive in comparison to work involved with selling a single apartment and the resulting benefit to the estate.

David Kittay was appointed as the chapter 7 Trustee on June 3, 2008. Since that date, Kittay and his firm have been instrumental in the difficult, but eventually successful sale of the Apartment, including negotiating the Stipulation resolving the priority of payments issue. Selling the Apartment was not a simple transaction. Kittay endeavored to sell the Apartment during the height of the financial tempest that still rocks the nation. Kittay also faced other hurdles, including (i) Kohls' refusal to sign a power to attorney to enable the sale to be completed; (ii) the Kohls' refusal to vacate the apartment; (iii) the Providentis' attempt to renegotiate or back out of their contract to purchase the Apartment; and (iv) litigation with the Kohls regarding damage to the Apartment. The firm's work was undoubtedly "necessary" and it benefited the estate. *See In re Keene Corp.*, 205 B.R. at 695 (holding that services are necessary if they benefit the estate).

17

Kittay and his firm should not be punished for the difficulties encountered in the case that were beyond his control. Courts should not use the benefit of hindsight to determine whether the work of an attorney was necessary. *In re Korea Chosun*, 337 B.R. at 767. The Court must determine whether the work was reasonable at the time it was performed. *In re Cenargo*, 294 B.R. at 595. The Court concludes that the firm's work for which it seeks compensation was necessary viewed from the vantage of the time it was performed.

Silverlining's objection that the fees incurred here are generally excessive in comparison to work involved with selling a single apartment and the resulting benefit to the estate also has no merit. "To assess the reasonableness of the time expended by an attorney, the court must look first to the time and work as they are documented by the attorney's records. Next the court looks to its own familiarity with the case and its experience generally." *In re Ambotiene*, 316 B.R. 25, 40 (Bankr. E.D.N.Y. 2004) (quoting *Santa Fe Natural Tobacco Co. v. Spitzer*, Nos. 00 Civ. 7274(LAP), 00 Civ. 7750(LAP), 2002 WL 498631, at *3 (S.D.N.Y. Mar. 29, 2007)). While the total attorney's fees here are higher than those involved in the typical apartment sale, they are warranted given the multiple unique challenges faced by the Trustee.

Kittay & Gershfeld's application is accompanied by a certification from David R. Kittay that satisfies all of General Order M-151's requirements. Kittay has also affixed detailed time entries as required by Federal Rule of Bankruptcy Procedure 2016. Based on the Court's review of the detailed time entries, the Court concludes that a reduction of $3,450.38 in fees should be made because of entries that include block-billing, charges for travel time within Manhattan, and professional charges for things like photocopying and filing that should be performed by secretaries.

### 5. *Trustee's Application for Interim Statutory Commissions*

The Trustee seeks an award of $75,787.97. Section 331 of the Bankruptcy Code allows

trustees and other professionals in Chapter 7 cases to file applications for interim fee awards.

*U.S. Trustee v. Fishback (In re Glados, Inc.)*, 83 F.3d 1360, 1367 (11th Cir. 1996). Courts

determining the appropriateness of an interim fee award examine the current availability of

funds, the existence of other accrued administrative obligations of the same or higher priority

that may deplete the funds, the continuing need for funds to pay necessary expenses in the future,

and the inability to file a final fee application in the near future. *Id.* (citing *In re Commercial

Consortium of California*, 135 B.R. 120, 124-25 (Bankr. C.D. Cal. 1991)). Courts do not grant

interim requests when the estate is administratively insolvent and the estate faces numerous

unresolved issues. *In re Soltan*, 234 B.R. 260, 280–81 (Bankr. E.D.N.Y. 1999).

### a. *Calculation of the Trustee's Commission*

Section 326(a) of the Bankruptcy Code provides the amount of commission the Trustee

may seek:

> In a case under chapter 7 . . . the court may allow reasonable
> compensation under section 330 of this title of the trustee for the
> trustee's services, payable after the trustee renders such services,
> not to exceed 25 percent on the first $5,000 or less, 10 percent on
> any amount in excess of $5,000 but not in excess of $50,000, 5
> percent on any amount in excess of $50,000 but not in excess of
> $1,000,000, and reasonable compensation not to exceed 3 percent
> of such moneys in excess of $1,000,000, upon all moneys
> disbursed or turned over in the case by the trustee to parties in
> interest, excluding the debtor, but including holders of secured
> claims.

11 U.S.C. § 326(a). As demonstrated from his moving papers, the Trustee seeks the maximum

statutory commission allowed on purported planned distributions of $1,751,265.76. Silverling

objects, arguing that the Trustee should not include payments to its own professionals in the $1.7

million figure when calculating its commission. Courts are split on this issue. Some find that

administrative payments to the trustee's own professionals should not be included when computing the trustee's award.  Others find it wholly acceptable to include all distributions, including those made to professionals employed by trustees when calculating the maximum statutory commission.  3 COLLIER ON BANKRUPTCY 326.02[2][e] ("There is disagreement over whether payments to administrative expense claimants should be included when computing the cap.").

Courts in the Eastern District of New York have explored this topic on multiple occasions.  In *In re Testaverde*, 317 B.R. 51 (E.D.N.Y. 2004), the court concluded that distributions to the trustee's professionals could not be included in the total when calculating the commission because these entities are not "parties in interest" as required by section 326.  *Id.* at 53–54.  According to the *Testaverde* court, Congress intentionally changed the language in section 326 indicating which distributions a trustee may use when calculating a commission from "any persons" to "parties in interest."  *Id.* at 55.  Relying upon a Black's Law Dictionary definition , the court found that this new language limited the distributions that could be used to calculate a commission to only monies paid to entities "whose pecuniary interest is directly affected by the bankruptcy proceeding."  *Id.* at 54.  The *Testaverde* court then reasoned that because professionals employed by trustees do not have pecuniary interests that are directly affected by the bankruptcy case, the plain language of section 326 precludes courts from including disbursements to such professionals when calculating trustees' commissions.  *Id.*  The court in *In re Stein*, No. 04-CV-3196, 2005 U.S. Dist. LEXIS 30278 (E.D.N.Y. Mar. 25, 2005), concurred with the *Testaverde* approach, finding that attorney's fees should not be included when calculating a trustee's commission under Section 326.  *Id.* at *16–20.

In *In re Vona*, 333 B.R. 191 (Bankr. E.D.N.Y. 2005), decided after *Testaverde* and *Stein*, the court concluded that administrative fees should be included when calculating a trustee's commission. The court in *Vona* looked to the language of the statute surrounding the term "parties in interest" and the interplay of sections of the Bankruptcy Code to demonstrate that the attorney's fees and other administrative claims should be included when calculating a trustee's commission. *Id.* at 196–98. By including the word "including" in the statute, the court reasoned that Congress intended a broad interpretation of the statute and not one cabined to the dictionary definition of "parties in interest." *Id.* at 195. The court noted that section 726 of the Code requires a trustee to make distributions from the estate in priority order, including distributions to the trustee's professionals. Under this logic, a trustee's professionals clearly have an interest in the distributions from an estate, as they are second in line to be paid from the liquidation of the estate. *Id.* at 196. Thus, for purposes of section 326 they should be considered parties in interest and distributions to these entities should be included when calculating the trustee's commission. The court concluded that:

> In counting distributions to be made by the chapter 7 trustee for purposes of determining the trustee's commission, the trustee must exclude distributions made to the debtor to pay exemptions and the surplus, but may include distributions to persons or entities who are owed administrative expenses as defined under sections 503 as well as to persons or entities who hold allowed secured, priority, and general unsecured claims.

*Id.* at 199.

Further, as indicated by the U.S. Trustee at oral argument, the practice in this district approved by the U.S. Trustee's Office is to include administrative expenses, such as attorney's fees when calculating the trustee's commission. Finally, because courts are also charged with determining the reasonableness of a trustee's commissions, there is little chance that including all disbursements made from the estate when calculating a commission will result in unnecessary

windfalls to the trustee.  Thus, the Trustee rightfully included payments made to its professionals when calculating its overall commission.

### b.  The Lodestar Test and the Reasonableness of the Trustee's Award

Permitting the Trustee to include administrative payments when calculating his commission, however, does not necessarily mean that the Trustee's total commission is reasonable.  Section 326 merely sets a maximum limit on the compensation that may be awarded to a trustee; section 330 still limits trustee's compensation to a reasonable amount.  *In re Brous*, 370 B.R. 563, 568–69 (Bankr. S.D.N.Y. 2007) (Bernstein, C.J.); 3 COLLIER ON BANKRUPTCY 326.02[1] ("As [section 326] clearly states, the amounts stated set an upper limit on the trustee's compensation.  It does not state or imply any entitlement by the trustee.").  Courts typically engage in a "lodestar" analysis to assist in determining whether these awards are reasonable.  *In re Brous*, 370 B.R. at 570.

Lodestar analyses consist of two steps.  First, a court calculates a lodestar amount by multiplying the number of hours expended on the case by a reasonable billing rate to guide what aggregate fee is reasonable under the circumstances.  *See Masterwear Corp. v. Angel & Frankel, P.C. (In re Masterwear Corp.)*, 233 B.R. 266, 277 (Bankr. S.D.N.Y. 1999).  Courts then examine whether any adjustment is necessary, looking to section 330 of the Bankruptcy Code and to twelve factors identified by the Fifth Circuit in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974).[2]  *See, e.g.*, *Bachman v. Pelofsky (In re Peterson)*, 251 B.R. 359, 363–65 (8th Cir. BAP 2000).  Enhancement of the lodestar calculation is only appropriate in *exceptional and*

---

[2]    The *Johnson* factors are:  (1) the time and labor required for the matter; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the services appropriately; (4) the preclusion of the professional from taking other cases by working on the matter; (5) the customary fee involved in similar instances; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client; (8) the sums involved and the results obtained; (9) the experience and ability of the employed professional; (10) whether the case is "desirable" or not; (11) the length of the relationship between the professional and the client; and (12) what awards were granted in similar cases.  488 F.2d at 720.

*rare circumstances* and must be supported by detailed evidence and specific findings.  *See, e.g.*,
*In re Brous*, 370 B.R. at 570; *In re Southeast Banking Corp.*, 314 B.R. 250, 269 (Bankr. S.D. Fl.
2004).  Any commission a court decides to award must not represent a windfall to a trustee.  *In
re THCR/LP Corp.*, No. 04-46898/JHW, 2008 WL 3194056, at *10 (Bankr. D.N.J. Aug. 1, 2008)
(citing *In re One City Centre Assocs.*, 111 B.R. 872, 879 (Bankr. E.D. Cal. 1990)).  The trustee
bears the burden of demonstrating that an upward revision is warranted.  *In re Brous*, 370 B.R. at
570.

     Here, the Trustee seeks an award of $75,787.97.  But, as evidenced by the detailed billing
narrative he submits in support of his application, his law firm completed $62,478.75 of work.
Thus, the trustee seeks approximately 1.2 times what he would otherwise be entitled to receive if
he charged his hourly rate.  While the Trustee did admirable work, negotiating a case filled with
numerous unexpected challenges to what appears to be the best possible resolution under the
circumstances, it is a stretch to characterize his accomplishments as exceptional or rare.  Thus,
the Court declines to order an enhancement to the Trustee's lodestar in these circumstances and
only approves an award of $62,478.75.

     The Trustee's use of his own law firm as counsel on this case supports this conclusion.
As a general matter, it is difficult for courts reviewing fee applications to separate work properly
completed by legal professionals from work properly completed by a trustee.  This concern is
multiplied when the trustee selects his own law firm as his counsel on the case.  *See In re Lehal
Realty Assocs.*, 112 B.R. 590, 591–92 (Bankr. S.D.N.Y. 1990) ("When a trustee in a bankruptcy
case selects his or her own firm, or is employed by the law firm, and performs legal services as
well as trustee duties, there is always a difficult line to be drawn between the necessary legal
services and the ministerial duties of the trustee.") (collecting cases).  Here, if the Trustee is

granted an award above the base lodestar amount, any time spent conducting legal work that is mistakenly included in the Trustee's bill will be compensated at approximately 1.2 times the value of the legal services—greater than the rates the Kittay firm would otherwise earn. Limiting a trustee's recovery to the amount of work he or she actually completed salves this prudential concern. *See In re Brous*, 370 B.R. at 571 ("On the other hand, if the trustee's compensation is based on the 'lodestar,' and the court applies the same billing rate to the trustee and legal services, the spill over of trustee work into his firm's fee application is irrelevant to the aggregate award."). Thus, because the Trustee has not demonstrated that his performance was rare or exceptional, and the practical concerns of granting trustee fees over the lodestar amounts when the trustee retains its own law firm to act as counsel, the Court refuses to grant the Trustee the maximum available under section 326 and limits the commission to $62,478.75.

## CONCLUSION

For the reasons explained above, the Court overrules Silverlining's objections to the Trustee's motion to make distribution from the proceeds of the sale of the Apartment. The Court further overrules Silverlining's objections to the fee applications. The approves fees in the following amounts:

- Lampert: Fees of $3,930 and expenses of $7.

- Offenberg: Denied without prejudice for Offenberg to submit a revised certification in compliance with General Order M-151.

- Akerman: Fees of $125,861.64 and $609.91 in expenses.

- Kittay & Gershfeld: Total fees of $391,067.62 and expenses of $15,582.70. As Kittay, however, currently only seeks payment of fees and expenses related to the sale of the Apartment at this time, the Court only authorizes payment of $318,724.87 in fees and $15,582.70 in expenses.

- Trustee: Commissions of $62,478.75.

Counsel for the fee applicants shall submit orders consistent with this Opinion.

DATED:          December 21, 2009
                New York, New York




                              **/s/Martin Glenn**
                              MARTIN GLENN
                         United States Bankruptcy Judge